# United States Court of Appeals
# for the Fifth Circuit

---

No. 24-51006

---

United States Court of Appeals
Fifth Circuit

**FILED**
August 6, 2025

Lyle W. Cayce
Clerk

Amanda Wood,

*Plaintiff—Appellant*,

*versus*

Bexar County, Texas; Deputy J. Gereb,

*Defendants—Appellees*.

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:21-CV-895

---

Before Elrod, *Chief Judge*, and Duncan and Engelhardt, *Circuit Judges*.

Kurt D. Engelhardt, *Circuit Judge*:

Amanda Wood was arrested for driving while intoxicated. After the charge was dismissed, Wood sued the county and the officer who arrested her, alleging constitutional and state law violations. The district court granted summary judgment for the defendants on all claims. Wood appeals the district court's judgment as to several of her claims. We AFFIRM.

No. 24-51006

## I.

The first half of the events at issue were not recorded on video and the parties tell two different stories of what occurred. We recount both versions.

## A.

Around 2:00 AM on August 4, 2019, a Bexar County peace officer, Deputy Joe Gereb, claims that he saw a white Honda sedan cross two traffic lanes without using a turn signal, straddle the striped line dividing two lanes, almost strike the curb separating the turnaround lane, and cross the solid white street lines.[1] Using his radar gun, he clocked the vehicle at 60 miles per hour in a 45 miles per hour zone. Accordingly, Deputy Gereb signaled for the vehicle to pull over, and the driver complied.

As Deputy Gereb approached the driver's side of the vehicle, he detected a strong odor of alcohol. He advised the driver that he "pulled her over for speeding, failing to maintain a single lane of traffic, failing to use her vehicle's turn signal, and disregarding traffic control devices," and requested her driver's license and proof of insurance. The driver began filming Deputy Gereb with her cell phone but complied with the document request, allowing Deputy Gereb to identify her as Amanda Wood. He also identified the sole passenger as Wood's then-husband, Christopher.

Deputy Gereb asked Wood whether she had consumed alcohol that evening, and she responded that she does not drink. Deputy Gereb expressed that he smelled a strong odor of alcohol emitting from the vehicle, asked her to exit the vehicle, and informed her that he was going to perform a roadside interview. Wood interrupted Deputy Gereb as he attempted to question her,

---

[1] Regular patrol deputies at the Bexar County Sheriff's Office, like Deputy Gereb, did not have body or dash cameras at the time of this incident.

2

and when asked whether she had gotten any sleep the night before, she responded "that's none of your concern." He informed her that his questions were associated with standardized field sobriety tests. She expressed that she did not consent to the interview and refused to comply with his questions. Deputy Gereb observed that her eyes were glossy and watery, her breath smelled of alcohol, and her speech was slurred.

While Deputy Gereb attempted to interview Wood, Christopher hung out of the passenger window, yelled, and appeared to record the interaction. At this point, Deputy Gereb called for additional assistance, handcuffed Wood, and placed her in the back of his patrol car while he waited for Deputy Brent Bible—an officer in Bexar County's Driving While Intoxicated specialized unit—to arrive.

## B.

Now for Wood's version of the facts. According to Wood, she and Christopher had just left her grandmother's 84th birthday celebration and were looking for an open restaurant when the events at issue occurred. She swears that she did not drink that evening, was not speeding, and did not violate any traffic laws. In fact, she says she was "driving cautiously because [she] was on the lookout for a 24 hour restaurant" and "didn't want to miss one, if there was one nearby." "At some point," Wood noticed flashing lights behind her and pulled over.

Deputy Gereb approached her car and asked for her driver's license and insurance, and she complied. She recalls that "[s]omehow, the topic of conversation turned to whether Deputy Gereb had a body camera recording the event." When he said that he did not, Wood "started to record the interactions with [her] cellular phone" because "Deputy Gereb's demeanor concerned [her]," and she "wanted documentation of what transpired."

Deputy Gereb then "started asking [Wood] personal questions," including questions about her medical history and whether she drank alcohol that night. She told him that she "did not drink alcohol at all." Eventually she viewed his questions as "too personal" and "pointless," so she stopped answering them. He then clarified that these questions were part of the field sobriety test and asked her to perform a physical field sobriety test. When she declined to perform such a test, he ordered her to get out of the car. He instructed her that "these Field Sobriety Tests were required by Bexar County" and called it a "no refusal" policy. According to Wood, Deputy Gereb "[e]ssentially" instructed her that "the direct result of refusing to perform Field Sobriety Tests was an arrest." Deputy Gereb "never really addressed the basis for the traffic stop," "didn't address traffic related matters," and "never attempted to write a traffic citation." Instead, he was "fixat[ed] on Field Sobriety Tests" and "was overzealous" in his "insist-ence" that she perform such a test.

Deputy Gereb and Wood "stood at the back of [her] car for quite some time." She felt that she could not ignore Deputy Gereb or leave, but declined to answer any further questions, perform any field sobriety tests, or provide any biological samples. Deputy Gereb informed her that she "was being arrested for refusing to perform Field Sobriety Tests," and then, "without any chance or opportunity [for Wood] to comply," "seized [her] arms in a rapid motion, and dynamically contorted them behind [her] back." He "then twisted and forced each arm downward, and inward so he could handcuff them." "This violent twisting of [her] arms caused piercing pain and discomfort in [her] shoulders." He then handcuffed her, "in a manner which cut into [her] wrists," put her in the back of his patrol car, and read her *Miranda* rights. He also seized her cell phone, which was never returned to her. She suspects that he deleted the video from her phone because it did not save to her cloud database.

## C.

The events after Deputy Gereb placed Wood in the back of his patrol car are undisputed, as they are recorded by Deputy Bible's body camera. The video begins with Deputy Bible approaching Wood in the backseat of Deputy Gereb's car and shining a flashlight in the car, and Wood immediately being hostile toward him. "Put the f**king phone away or whatever the f**k you have," is the first thing she is recorded saying.

Deputy Bible explained that it was a flashlight, but that he was recording her on camera, and introduced himself. He stated that he could smell alcohol and asked how much she had consumed. She replied with a laugh, "Sir, I don't drink." When Deputy Bible mentioned that Deputy Gereb sought to perform sobriety field tests, Wood hostilely responded, "Sir, he cannot perform whatever he wants without it being consensual. I don't understand why he pulled me over. I don't understand what the f**k he wants." Deputy Bible attempted to explain why Deputy Gereb pulled her over, but she repeatedly spoke over him. Eventually Deputy Bible was able to explain that Deputy Gereb pulled her over for failing to maintain a single lane and speeding, and that both deputies detected the strong odor of alcohol.

Deputy Bible explained that he and Deputy Gereb were "trying to check and make sure that [her] physical and mental faculties [were] there for [her] to be operating a motor vehicle safely on the roadway," prompting Wood to nonsensically respond, "I understand and I know how far I am from my house—I understand that I need to go home sir so if you are recording me you should understand that I'm not mentally retarded." When he reiterated that he was trying to ensure that her mental and physical faculties were sufficient to operate a motor vehicle, Wood rambled: "Sir I am 100% mentally okay, I am 100% and I work my ass off and do a lot of sh*t that I don't need to be explaining to you just because you're an officer or you're wearing a

public servant uniform." He expressed that he was just doing his job, to which she replied, "I think you should be doing something else." Patiently, he explained that they were trying to ensure that people get home safely. Contradicting her earlier statement that she needed to go home, Wood responded: "The only thing I'm trying to do is go out to eat with my husband, I don't know what you're making up or what y'all are going through, and I understand that y'all deal with f**king idiots and sh*t like that but you know what? I'm not f**king one of them." After Deputy Bible accused her of putting words in his mouth, she incoherently apologized: "I'm sorry, I didn't mean to make you say things like that . . . I'm not talking to you I'm just generally speaking -- like this public world -- generally speaking." He then asked whether she would consent to a field sobriety test, and she emphatically declined. Deputy Bible accepted her refusal and shut the door. On multiple occasions throughout this conversation, Wood slurred her words and had difficulties keeping her eyes open.

Deputy Bible then walked toward Wood's car to talk to Christopher. As he walked over, he and Deputy Gereb discussed how they could both smell the alcohol on Wood, with Deputy Bible noting "it is strong." Deputy Bible proceeded to introduce himself to Christopher. Christopher said that he and Wood were coming from the movie theater and denied that they had been drinking.[2] Deputy Bible informed him that Wood was going to be arrested for driving while intoxicated because of the strong odor of alcohol emitting from her body, and that Deputy Gereb would apply for a warrant to draw her blood because she refused a field sobriety test. Deputy Bible gave Christopher the option of performing a field sobriety test and driving the car

---

[2] Christopher later filed an affidavit stating that they were on their way home from a bar where he "drank about three Jamison whiskies" and Wood had at least two alcoholic mixed drinks. He said that they stopped drinking about ten minutes before leaving the bar.

home or impounding the car. Christopher said that he would "rather not" perform the field sobriety test and opted to have the car impounded.

After completing paperwork, Deputies Gereb and Bible returned to Wood, seated in the back of the patrol car. As Deputy Gereb began reading Wood her rights, she stuck her head out of the patrol car, and slurring her words, yelled: "Chris, don't consent to anything, Chris! This officer is unlawfully arresting me, or whatever he's doing." She then continued to talk over Deputy Gereb for the full almost four minutes that it took him to read her rights. Her one-sided dialogue included a smorgasbord of indecipherable mumbles, slurred words, profane insults, incoherent rants, non sequiturs to Christopher, and vehement refusals to consent to a sobriety test—despite that Deputy Gereb was explaining her rights, not seeking her consent.

"I disregard any blood test, and I heard you, I'm not stupid. I refuse -- that's my civil rights -- exactly, I do need an attorney because you're unlawfully arresting me, you don't even know what you're reading, you're retarded," Wood rambled at one point before sticking her head back out the door to again yell at Christopher: "You don't have to consent to anything, Christopher Shane Wood, don't consent to anything, this guy is a f**got." She then turned back to Deputy Gereb, who was relentlessly reading her rights, and told him, "Shut up, sir. You're a b***h. Just hurry up, sir," and then continued to yell about how the arrest was unlawful.

"You keep saying that you pulled me over for a traffic violation, which I truly understand, but you're saying I'm drunk! I'm not even drunk!" Wood next exclaimed before asserting, "I don't need to consent to anything" seven times in succession. She visibly struggled to keep her head up while mumbling, mimicking Deputy Gereb, and proclaiming that Deputy Gereb "doesn't even know how to talk." She then yelled to Christopher to ask if he was going to jail too. When he expressed that he did not think so, she

responded, "well take care of the kids -- our three kids," before directing her attention back to Deputy Gereb and mumbling: "Sir, f**k off. F**got. Get the f**k away, you b***h. [Indiscernible] You're a f**king f**got. Get the f**k out of my face, f**k you, f**k off, I don't consent to sh*t." She then stuck her head out the door and shouted: "F**k you camera, I don't consent to sh*t. F**k off. I don't care! F**k you. I don't give a f**k, get the f**k out of my face," before returning to rambling about how she was being unlawfully arrested and how Deputy Gereb is "stupid." Eventually, Deputy Gereb finished reciting Wood's rights. Even after the deputies shut the door, Wood could be heard screaming.

Deputy Bible remained on the scene with Christopher while Deputy Gereb transported Wood to the Bexar County Adult Detention Center for booking, where she again refused to voluntarily provide a breath or blood sample. Deputy Gereb then completed and filed an Affidavit for Search Warrant and Magistration. In the affidavit, Deputy Gereb checked boxes indicating that Wood had a strong odor of alcohol; slurred speech; talkative, cocky, excited, profane, and insulting attitude; hesitant balance; and swaying walk.[3] He also wrote: "Driver had slurred speech, glossy eyes, and had a strong odor of alcohol emitting from her breath and vehicle." At 4:10 AM, a Bexar County Magistrate Judge signed a search warrant authorizing the involuntary removal of blood samples from Wood.

A second body camera video shows Wood at the jail preparing to get her blood drawn. The video begins with several officers in tactical gear handling a combative, handcuffed Wood and moving her into a chair. There is no audio during the first 30 seconds of the video, but Wood is visibly yelling

---

[3] In an affidavit filed at the district court, Deputy Gereb expressed that he mistakenly checked the box indicating that Wood swayed when she walked.

at the officers. Wood is then heard yelling, "Let me go b***h! What's wrong with you retards? Y'all are so stupid." as the officers placed her in the chair. It took five officers to restrain Wood to the chair. One officer restrained her head while two strapped a belt across her waist and two others restrained her legs.

Once her legs were restrained, all five officers worked together to first restrain her body and then to control her arms while they removed her handcuffs and restrained her arms to the chair. At least seven other jail officials observed. Wood is heard during this time calling the officers "f**king f**gots," "f**king retarded," and "f**king stupid," and telling them that she "can't wait until [her] attorney finds out about this sh*t." Once they secured her, she told the officers: "Okay hurry the f**k up, I've been here for two f**king hours" and called one a "f**got ass." The officer wearing the body camera then asked the medical staff whether they were ready, prompting Wood to aggressively yell: "They haven't been f**king ready. They told me to wait outside. They are f**king [indiscernible] the f**king office, retard. You've asked like a hundred f**king times, you're so stupid." She continued to hurl profane insults at the officers while they waited for the medical professionals to prepare for the blood draw. The video concludes after the officer announces that he is putting the camera "on standby for medical evaluation."

Wood's blood was eventually drawn at 5:03 AM, roughly three hours after Deputy Gereb initiated the traffic stop. The toxicology report recorded a blood alcohol content of 0.019. According to an expert report submitted by Deputy Gereb and Bexar County—and not rebutted or challenged by Wood—the toxicology report confirmed that Wood had been drinking that evening, and that her blood alcohol content likely would have been between 0.05 and 0.11 three hours earlier when she was driving. The Bexar County

Criminal District Attorney's Office nonetheless dismissed the charge against Wood, citing insufficient evidence.

## D.

Wood subsequently filed this lawsuit against Deputy Gereb and Bexar County. Against Deputy Gereb, she alleged a First Amendment retaliation claim; Fourth Amendment claims for unreasonable search of her person, unreasonable search of her car, excessive force, obtaining a search warrant via false information (*Franks v. Delaware*, 438 U.S. 154 (1978) violation), and malicious prosecution; and state law claims for malicious prosecution and intentional infliction of emotional distress. Against Bexar County, she alleged *Monell* claims premised on various policies that she alleges violate the Fourth and Fourteenth Amendments. The district court concluded that Deputy Gereb is entitled qualified immunity and granted summary judgment for Deputy Gereb and Bexar County on all claims. Wood timely appealed.

## II.

Before reaching Wood's substantive challenges, we address her several evidentiary objections. We review a district court's summary judgment evidentiary rulings for abuse of discretion. *Hager v. Brinker Tex., Inc.*, 102 F.4th 692, 697 (5th Cir. 2024). The harmless error doctrine also applies. *Winzer v. Kaufman County*, 916 F.3d 464, 473 (5th Cir. 2019) (per curiam). An error is harmless if it does not tip the balance of the outcome at summary judgment. *Cf. id.*

## A.

First, Wood argues that the district court abused its discretion by considering Christopher's affidavit. Because the affidavit conflicted with Christopher's statements to Deputy Bible at the scene, Wood concludes that the affidavit is perjured and inadmissible. We interpret Wood's argument as

invoking the "sham affidavit doctrine," which was the basis for her objection at the district court. The sham affidavit doctrine "allows a district court to disregard statements made in an affidavit that are so markedly inconsistent with a prior statement as to constitute an obvious sham." *Rodriguez v. City of Corpus Christi*, 129 F.4th 890, 897 (5th Cir. 2025) (internal quotation marks and citation omitted). It applies when an affidavit conflicts with the affiant's prior *sworn testimony*, typically deposition testimony. *See, e.g.*, *Seigler v. Wal-Mart Stores Tex., L.L.C.*, 30 F.4th 472, 477 (5th Cir. 2022). Because Christopher's statements to Deputy Bible were not sworn testimony, the sham affidavit doctrine does not apply. The district court did not abuse its discretion.[4]

## B.

She next contends that the district court abused its discretion by not striking the jail videos, which she says were untimely disclosed and produced. Wood's objection to this evidence is not that the district court's consideration of it prejudiced her. To the contrary, she says that the videos "show shocking 14th Amendment violations of civil rights and medieval torture." Instead, she argues that the district court should have excluded this evidence because it was produced after the deadline to amend her complaint to add additional claims and defendants.

To the extent that Wood challenges the district court's use of this evidence on summary judgment, we are admittedly perplexed, given that she

---

[4] Even if the sham affidavit doctrine applied, any error would be harmless. We affirm the district court on all appealed claims without relying on Christopher's affidavit. *See infra* Sections IV, V.

No. 24-51006

seemingly views it as helpful to her. Regardless, she has not demonstrated that the district court abused its discretion.[5]

## C.

Wood also asserts hearsay objections to several pieces of evidence. First, she submits that the body camera and jail videos are unauthenticated and inadmissible hearsay because they were not admitted through a witness and custodian. Second, she contends that various Bexar County law enforcement documents are inadmissible hearsay that cannot be admitted under the public or business records exceptions.

"At the summary judgment stage, materials cited to support or dispute a fact need only be *capable* of being 'presented in a form that would be admissible in evidence.'" *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (quoting Fed. R. Civ. P. 56(c)(2)). Wood does not object that this evidence "*cannot* be presented in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2) (emphasis added). Instead, she relies on caselaw addressing evidence admitted *at trial* to demonstrate that the district court impermissibly considered this evidence at summary judgment. Wood has not demonstrated that the district court abused its discretion.

_____

[5] To the court's knowledge, based on a review of the record, Wood never requested leave from the district court to amend her complaint. To the extent Wood argues that the district court erred by not permitting her to amend her complaint in light of this evidence, she cannot raise that argument on appeal for the first time. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an argument by failing to raise it in the first instance in the district court—thus raising it for the first time on appeal—or by failing to adequately brief the argument on appeal.").

D.

Next, Wood argues that, by not challenging the statement of facts she submitted in her response to *their* motion for summary judgment, Deputy Gereb and Bexar County admitted her version of the facts, entitling *her* to summary judgment. Wood's argument that the district court erred by not granting summary judgment for *her*—when she never sought summary judgment—once again leaves the court perplexed. Regardless, the undisputed facts demonstrate that Deputy Gereb and Bexar County—not Wood—were entitled summary judgment. *See infra* Sections IV, V.

E.

Finally, Wood argues that the initial traffic stop was unlawful, rendering all subsequent events also unlawful. She seems to invoke the fruit-of-the-poisonous-tree doctrine. This evidentiary *criminal* procedure doctrine is inapplicable in a 42 U.S.C. § 1983 civil damages suit. *See De La Paz v. Coy*, 786 F.3d 367, 371 n.3 (5th Cir. 2015); *Townes v. City of New York*, 176 F.3d 138, 145–46 (2d Cir. 1999); *Black v. Wigington*, 811 F.3d 1259, 1267–68 (11th Cir. 2016); *Codrington v. Dolak*, 142 F.4th 884, 895 (6th Cir. 2025).

III.

Having determined that Wood's evidentiary challenges fail, we turn to whether the district court erred by granting summary judgment for Deputy Gereb and Bexar County. We review a district court's grant of summary judgment *de novo*. *McVae v. Perez*, 120 F.4th 487, 491 (5th Cir. 2024), *cert. denied*, --- S. Ct. ---, 2025 WL 1549791 (2025). A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). We generally review summary judgment evidence in the light most favorable to the nonmovant. *Carnaby v. City of Houston*, 636

F.3d 183, 187 (5th Cir. 2011). But when the incident is recorded on video, we rely on the facts as depicted in the video. *McVae*, 120 F.4th at 491.

## IV.

## A.

We begin with Wood's claims against Deputy Gereb. Deputy Gereb asserts the defense of qualified immunity. Qualified immunity protects a state official from civil suit and liability if he could have reasonably believed that his actions were legal. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). A state official is entitled qualified immunity unless (1) the evidence demonstrates that his conduct violated a statutory or constitutional right; and (2) that right was "clearly established" at the time of the violation. *McVae*, 120 F.4th at 492. Courts may analyze either prong first. *Cope v. Cogdill*, 3 F.4th 198, 204 (5th Cir. 2021).

A good-faith assertion of qualified immunity shifts the traditional summary judgment burden. *Ratliff v. Aransas County*, 948 F.3d 281, 287 (5th Cir. 2020). To survive summary judgment, the plaintiff must present evidence demonstrating that qualified immunity does not apply. *Id.*

While she initially alleged eight claims against Deputy Gereb, Wood only appeals the district court's ruling on four: (1) false arrest in violation of the Fourth Amendment, (2) retaliatory arrest in violation of the First Amendment, (3) malicious prosecution in violation of the Fourth Amendment; and (4) a *Franks v. Delaware* violation. We address each in turn.

## B.

### 1. False Arrest

"A false arrest occurs, and an individual's Fourth Amendment rights are violated, when an officer conducts an arrest without probable cause." *Scott v. City of Mandeville*, 69 F.4th 249, 255 (5th Cir. 2023). An officer has

probable cause if "the totality of the facts and circumstances" within his knowledge "at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Id.* The question is whether there is a "fair probability"—*i.e.*, "more than a bare suspicion" but not necessarily 50% certainty—that a crime occurred. *Id.*

"A person commits an offense," under Texas law, "if the person is intoxicated while operating a motor vehicle in a public place." Tex. Penal Code Ann. § 49.04. "Intoxicated" means either (1) "not having the normal use of mental or physical faculties by reason of the introduction of alcohol . . . into the body" or (2) "having an alcohol concentration of 0.08 or more." *Id.* § 49.01(2)(A)–(B).

Deputy Bible's body camera footage establishes that Wood was belligerent and uncooperative, slurred her words, and refused to complete the field sobriety test. At times, she was incoherent and struggled to keep her eyes open and her head upright. Further, she has not proffered competent evidence to dispute that she smelled of alcohol. Rather she simply argues that Deputy Gereb "said he 'smelled alcohol' yet couldn't describe that smell in words, nor associate the smell with any type of alcoholic drink," and points to what she calls "a scientific study [that] proved police are not able to detect the 'smell' of alcohol on motorists—particularly when suspects have eaten." Wood improperly relies on this study as if it is an expert report, without following any of the requisite expert procedures. That Wood smelled like alcohol is therefore not genuinely disputed.

Wood maintains that Deputy Gereb arrested her solely for refusing to perform field sobriety tests.[6] The undisputed facts demonstrate that this is

---

[6] Wood cites *Halbert v. City of Sherman*, 33 F.3d 526 (5th Cir. 1994) for the premise that "[r]efusing to perform field sobriety tests doesn't provide probable cause to arrest, or anything else." This premise is nowhere to be found in *Halbert*, which affirmed dismissal

No. 24-51006

false; Wood exhibited several other signs of intoxication. But we do agree with our sister circuits that "refusal to submit to a field sobriety test, combined with evidence of alcohol consumption, [can] give rise to probable cause sufficient to arrest a driver for driving under the influence of alcohol." *Kinlin v. Kline*, 749 F.3d 573, 580 (6th Cir. 2014); *see also Wilder v. Turner*, 490 F.3d 810, 815 (10th Cir. 2007) ("A prudent officer could reasonably conclude from Plaintiff's refusal to participate in a field sobriety test coupled with the observation of several indicators of excessive alcohol consumption that Plaintiff was under the influence of alcohol."); *Miller v. Harget*, 458 F.3d 1251, 1260 (11th Cir. 2006) ("A prudent officer could conclude from a refusal to take a test, coupled with the smell of alcohol, that the driver had in fact been drinking."). As the Eleventh Circuit has reasoned, "[s]ubmitting to a breathalyzer test is a minor inconvenience for a driver and an easy opportunity to end a detention before it matures into an arrest." *Miller*, 458 F.3d at 1260. When a plaintiff chooses "not to endure this minor inconvenience" it is reasonable for an officer to "view [that] choice as evidence of guilt." *Id.* Any other conclusion would allow a driver to "escape arrest simply by refusing to cooperate." *Id.*

The undisputed facts demonstrate that Deputy Gereb had probable cause to arrest Wood for driving while intoxicated. Because Wood has not established a constitutional violation, Deputy Gereb is entitled qualified immunity on the false arrest claim.

---

of a Texas law false arrest claim against a private citizen who reported to police that the plaintiff was intoxicated. *Id.* at 528–29. After the private citizen reported the plaintiff, the police conducted sobriety tests and arrested the plaintiff. *Id.*

16

No. 24-51006

## 2. Retaliatory Arrest

Wood alleges that Deputy Gereb arrested her because she exercised her First Amendment right to film public activities of law enforcement. A plaintiff cannot prevail on a First Amendment retaliation claim unless he either (1) proves the absence of probable cause for his arrest, or (2) "presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves v. Bartlett*, 587 U.S. 391, 402, 407 (2019). If the plaintiff meets that burden, he must also prove "that the retaliation was a substantial or motivating factor behind the arrest." *Id.* at 404 (alterations adopted).

Because there was probable cause for Wood's arrest, *see supra* Section IV.B.1, and she has not presented evidence that she was arrested when similarly situated individuals not engaged in protected speech were not, Deputy Gereb is entitled qualified immunity.[7]

## 3. Malicious Prosecution

From 2003 to 2021, our court "explicitly denied the possibility of a constitutional malicious prosecution claim." *Espinal v. City of Houston*, 96 F.4th 741, 748 (5th Cir. 2024) (citing *Guerra v. Castillo*, 82 F.4th 278, 289 (5th Cir. 2023)). Wood's arrest and prosecution occurred in 2019. Her malicious prosecution claim therefore fails the clearly-established prong of qualified immunity.

---

[7] Wood's argument that she was arrested when a similarly situated individual—her husband, Christopher—was not is frivolous. Wood was arrested for *driving* while intoxicated. Christopher was not driving.

No. 24-51006

### 4. Franks v. Delaware

Even if an independent magistrate approves a warrant application, "a defendant's Fourth Amendment rights are violated if (1) the affiant, in support of the warrant, includes a false statement knowingly and intentionally, or with reckless disregard for the truth, and (2) the allegedly false statement is necessary to the finding of probable case." *Arizmendi v. Gabbert*, 919 F.3d 891, 897 (5th Cir. 2019) (quotation marks and citation omitted); *see Franks v. Delaware*, 438 U.S. 154 (1978).

Wood submits that Deputy Gereb made three false statements in his search warrant affidavit: (1) that he "smelled alcohol"; (2) that Wood was "swaying"; and (3) that Wood's eyes were "glossy." First, we have already determined that whether Wood smelled of alcohol is not genuinely disputed. *See supra* Section IV.B.1. We have also determined—without considering evidence that Wood was swaying or had glossy eyes—that Deputy Gereb had probable cause to arrest Wood for driving while intoxicated. *See id.* So even if those were false statements, they were not necessary to the finding of probable cause. *See Arizmendi*, 919 F.3d at 897. The district court properly granted summary judgment for Deputy Gereb.

### V.

### A.

Now for Wood's claims against Bexar County. Wood brings several municipality liability claims under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). To prevail on a *Monell* claim, a plaintiff must establish (1) an official policy or custom; (2) the policymaker of that policy or custom; and (3) a constitutional violation that the policy or custom was the "moving force" behind. *Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 509 (5th Cir. 2022).

18

Wood spills considerable ink cataloging Bexar County's allegedly unconstitutional policies. But to prevail on a *Monell* claim, she must have suffered a constitutional violation. *See id.* We have already determined that there was probable cause for Wood's arrest. *See supra* Section IV.B.1. So to the extent Wood asserts a *Monell* claim premised on being arrested without probable cause, Bexar County is entitled summary judgment. As far as we can tell, the only other constitutional violations that Wood alleges in connection with her *Monell* claims are an unconstitutional *Terry* stop and excessive force.

## B.

### 1. Terry Stop

Wood seems to argue that the traffic stop was an illegal *Terry* stop because (1) Deputy Gereb lacked a legitimate basis to stop her in the first place; (2) the stop lasted 35 minutes; and (3) she did not receive a ticket.

Warrantless searches and seizures are generally *per se* unreasonable under the Fourth Amendment. *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). The *Terry* stop is one exception to this rule. *Id.* (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). Under this exception, an officer may briefly detain—*i.e.*, "seize"—a person if the officer has a "reasonable suspicion" that the person is committing a crime. *Alexander v. City of Round Rock*, 854 F.3d 298, 303 (5th Cir. 2017). "Reasonable suspicion" is a "less demanding" standard than probable cause, but the officer must "be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Id.* at 303–04 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000)) (internal quotation marks omitted).

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as

a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). To remain legal, the stop generally "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc). But "if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *Lopez-Moreno*, 420 F.3d at 431.

Deputy Gereb proffered evidence that, using his radar gun, he clocked Wood driving 60 miles per hour in a 45 miles per hour zone. While Wood disputes that she was speeding, she presents no evidence to dispute Deputy Gereb's testimony that his radar gun indicated otherwise. *See Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009) (per curiam) (providing that the officer's "uncontradicted testimony that his radar gun indicated that [the plaintiff] was speeding could establish probable cause" that the plaintiff was speeding, even though "she testified that she was in fact not speeding, as evidenced by the fact that she set her vehicle's cruise control at the 40mph speed limit" because "evidence that the arrestee was innocent of the crime is not necessarily dispositive of whether the officer had probable cause to conduct the arrest"). The undisputed evidence demonstrates that Deputy Gereb had a reasonable suspicion that Wood committed a traffic violation.

Next, contrary to Wood's claim that the stop was illegal because it lasted 35 minutes, there is no brightline rule for how long a *Terry* stop may constitutionally last. *United States v. Smith*, 952 F.3d 642, 647 (5th Cir. 2020). Because Wood has presented no evidence to establish that the stop lasted longer than necessary to dispel or confirm any reasonable suspicion, *see Lopez-Moreno*, 420 F.3d at 430–31, this argument fails too.

Wood's final argument—that the stop was illegal because she did not receive a traffic citation—also fails. She seems to claim that Deputy Gereb's justification for the stop was pretextual. But "an officer's subjective intentions have no impact on analyzing reasonable suspicion or probable cause because they are both considered to be based on an objective test." *Id.* at 432. "So long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment[.]" *Goodwin v. Johnson*, 132 F.3d 162, 173 (5th Cir. 1997). We have already determined that Deputy Gereb had a reasonable suspicion that Wood committed a traffic violation. Whether he pulled her over for some other subjective reason is irrelevant.

Wood has not established a Fourth Amendment violation premised on an illegal *Terry* stop.

## 2. Excessive Force

Wood makes two excessive force allegations: (1) Deputy Gereb "used unnecessary force in handcuffing her" and (2) the officers at the jail "resorted to medieval torture" to extract her blood.

Force used against a pretrial detainee is "excessive" in violation of the Fourteenth Amendment if it was "objectively unreasonable." *Austin v. City of Pasadena*, 74 F.4th 312, 322 (5th Cir. 2023) (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015)). To determine reasonableness, we weigh several factors: (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or limit the amount of force; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting. *Id.* (citing *Kingsley*, 576 U.S. at 397).

It is well established that "minor, incidental injuries that occur in connection with the use of handcuffs to effectuate an arrest do not give rise to a constitutional claim for excessive force." *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007). To support an excessive force claim, a plaintiff must have suffered more than *de minimis* injuries from the handcuffing. *See, e.g.*, *Buehler v. Dear*, 27 F.4th 969, 982–83 (5th Cir. 2022). Wood has produced no such evidence here.

For her blood extraction allegations, we rely on the video evidence. The county officials had a warrant to draw Wood's blood. Because Wood refused to voluntarily comply with the warrant, the officers had to restrain her. And because she actively resisted their attempts to restrain her, they had to exercise some force. But the video shows that they did not use greater force than necessary. Further, Wood has not proffered any evidence that the officers' use of force injured her.

Wood has failed to demonstrate that either Deputy Gereb or the officers at the jail used excessive force in violation of the Fourteenth Amendment. Because she has not established a constitutional violation, as required for a *Monell* claim, the district court properly granted summary judgment for Bexar County.

The judgment of the district court is AFFIRMED.